UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT DYKES,

      *Plaintiff,*

*v.*                        CASE NO. 13-CV-13812

McROBERTS, ET AL.,          DISTRICT JUDGE JOHN C. O'MEARA
                              MAGISTRATE JUDGE PATRICIA T. MORRIS

      *Defendants.*
_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

## I.    RECOMMENDATION

For the reasons set forth below, **IT IS RECOMMENDED** that Defendants' motion for summary judgment (Doc. 30) be **GRANTED;** Plaintiff's motion for default judgment (Doc. 32) be **DENIED**; Plaintiff's motion for summary judgment (Doc. 34) be **DENIED**; and Plaintiff's objection to the Court's order requiring response (Doc. 32) be **DENIED**.

## II.    REPORT

### A.    Introduction

On September 6, 2013, Plaintiff Robert Dykes filed the instant complaint, alleging that several prison officials violated his rights to procedural due process and equal protection, and retaliated against him through a misconduct report charging him with unauthorized occupation of a cell or room, and a subsequent retaliatory transfer following

his complaint about that inequitable treatment. (Doc. 1). On September 19, 2013, District Judge John Corbett O'Meara issued an opinion and order dismissing all of Dykes' claims, finding that he failed to state a claim upon which relief could be granted. (Doc. 4). On January 9, 2014, Dykes filed a motion for reconsideration (Doc. 5), which was denied on June 30, 2014 (Doc. 8). On July 23, 2013, Dykes appealed that decision to the Sixth Circuit Court of Appeals. (Docs. 9, 10, 11). On April 10, 2015, the Sixth Circuit affirmed the dismissal of Dykes' due process claims, but found that his equal protection and retaliation claims were not addressed, and remanded them to the district court for further consideration. (Doc. 16). On June 15, 2015, this matter was referred to the undersigned magistrate judge. (Doc. 18).

Service of process has been waived as to all defendants. (Docs. 24, 25, 26, 27, 28). On September 15, 2015, Assistant Attorney General for the State of Michigan, Allan J. Soros, appeared on behalf of all defendants. (Doc. 29). On that same date, Defendants filed a motion for summary judgment as to Dykes' remaining claims, asserting that he failed to exhaust his administrative remedies. (Doc. 30). Also on that date, the Court ordered Dykes to respond to Defendants' motion for summary judgment. (Doc. 31).

On September 24, 2015, Dykes filed an objection to the Courts' order requiring a response, asserting that he "cannot issue a response to Defendant's [sic] [motion for] summary judgment because he was never issued or served with" that motion. (Doc. 32 at 1). Dykes referred the Court to the "'legal mail sign-in sheet,'" asserting that he must sign for any legal mail, and that he had not signed for any letters from Defendants. (*Id.*).

2

Dykes also claimed that his "fears of being prejudice did manifest, as he never received a notice of appearance or response from the defendants despite the correspondences he sent to the court clerk inquiring as to these matters." (*Id.* at 2). Dykes further claimed that he was unaware as to the identity of Defendants' counsel; he thus requested "enough time to respond once he receives this motion for summary judgment." (*Id.*). In an attached affidavit, Dykes averred that, as of September 24, 2015, he "never received any reply or documentation that defendants had been served, that the defendants filed an appearance, response, or motion for summary judgment." (*Id.* at 4).

Dykes' September 24, 2015, filing also contained a motion for default judgment, in which he asserted that Defendants defaulted by failing to respond to his complaint and failing to serve him with their motion for summary judgment. (Doc. 32 at 2).

On September 28, 2015, Dykes filed a response to Defendants' motion for summary judgment, along with his own motion for summary judgment. (Doc. 34). There, Dykes argues that Defendants failed to "offer[] any evidence in opposition to the facts asserted by the plaintiff in response to exhaustion," and asserted that his failure to exhaust his administrative remedies was the result of fears of "more retaliation." (*Id.* at 1-2). Asserting that Defendants failed to make their case for summary judgment, Dykes requested that the Court grant him summary judgment instead. (*Id.* at 5). On October 1, 2015, Defendants filed a response to Dykes' motion for default judgment (Doc. 33), and on October 20, 2015, Dykes filed a reply (Doc. 35).

### B.     Motion for Summary Judgment Standard

A motion for summary judgment will be granted under Rule 56 of the Federal Rules of Civil Procedure when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). All facts and inferences must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party has "'the initial burden of showing the absence of a genuine issue of material fact' as to an essential element of the non-movant's case." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting *Celotex Corp. v Catrett*, 477 U.S. 317, 323 (1986)). In determining whether the moving party has met its considerable burden, a court may consider the plausibility of the moving party's evidence. *Matsushita*, 475 U.S. at 587-88. Summary judgment is also proper where the moving party shows that the non-moving party is unable to meet its burden of proof. *Celotex*, 477 U.S. at 325.

The non-moving party cannot rest merely on the pleadings in response to a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Instead, the non-moving party has an obligation to present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993). The non-movant cannot withhold evidence until trial or rely on speculative possibilities that material issues of fact will appear later. 10B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2739 (3d ed. 1998). "[T]o withstand a properly supported

4

motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party." *Cosmas v. American Express Centurion Bank*, 757 F. Supp. 2d 489, 492 (D. N.J. 2010). In doing so, the nonmoving party cannot simply assert that the other side's evidence lacks credibility. *Id.* at 493. And while a *pro se* party's arguments are entitled to liberal construction, "this liberal standard does not, however, 'relieve [the party] of his duty to meet the requirements necessary to defeat a motion for summary judgment.'" *Veloz v. New York*, 339 F. Supp. 2d 505, 513 (S.D. N.Y. 2004) (quoting *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003)). "[A] pro se party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D. N.Y. 1995) (quoting *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

When the non-moving party fails to adequately respond to a summary judgment motion, a district court is not required to search the record to determine whether genuine issues of material fact exist. *Street*, 886 F.2d at 1479-80. The court will rely on the "facts presented and designated by the moving party." *Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 404 (6th Cir. 1992). After examining the evidence designated by the parties, the court then determines "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson*, 477 U.S. at 251-52). Summary judgment will not be

granted "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

**C.   Analysis**

    **i.   Service Issues and Default Judgment**

Before addressing the parties' motions for summary judgment, the Court will consider Dykes' motion for default judgment. Default can occur when the defendant fails to appear in a case, or having appeared, fails to answer the complaint or otherwise defend against it. Fed. R. Civ. P. 55(a); *see also* 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2681 (3d ed. 1998). The Sixth Circuit does not favor default, calling it "a drastic step which should be resorted to only in the most extreme cases." *United Coin Meter Co., Inc. v. Seaboard Coastline RR.*, 705 F.2d 839, 845 (6th Cir. 1983) (quoting *Ellingsworth v. Chrysler*, 665 F.2d 180, 185 (7th Cir. 1981)).

In this case, default judgment against Defendants is inappropriate because there is no support in the record for Dykes' assertion that he did not timely receive service of Defendants' pleadings. Indeed, whereas Dykes asserts that he did not receive any "any reply or documentation that the defendants had been served, that the defendants filed an appearance, response or motion for summary judgment" (Doc. 32 at 4), the legal mail sign-in sheet to which he directs the court actually demonstrates that he received a package from the Michigan Attorney General's office on September 18, 2015. (Doc. 33 at Ex. A). The contents of this delivery are not listed, but given the close proximity to the entry of Defendants' September 15, 2015, motion for summary judgment, it is reasonable

6

to assume that Defendants' motion was included in the package. Furthermore, Dykes does not merely assert that he did not receive Defendants' motion, but rather asserts that he received no correspondence from Defendants whatsoever. (Doc. 32 at 4). Dykes makes no effort to correct or clarify this discrepancy in his latter filings.

Furthermore, while Dykes asserts that he was prejudiced by Defendants' alleged failure to serve, he was able to respond to Defendants' motion for summary judgment on September 28, 2015, more than a week ahead of the Court's October 6 deadline. (Docs. 31, 34). There is thus no reason to believe that Dykes received Defendants' motion for summary judgment tardily, and even assuming that he did, any resulting prejudice had no impact on his ability to respond in a timely fashion. Dykes' motion for default judgment (Doc. 32) should thus be denied, as should his objection to the Court's order requiring response (Doc. 31).

### ii.    Motions for Summary Judgment

#### a.    Dykes' Claims

Dykes' September 6, 2013, complaint has not been amended, and therefore remains the operative complaint. (Doc. 1). In that complaint, Dykes asserts that he suffered deprivations of constitutional rights as the result of a misconduct hearing and subsequent transfer by officers at the Gus Harrison Correctional Facility ("ARF") to the Bellamy Creek Correctional Facility ("IBC"). (Doc. 1 at 1-14). The factual circumstances surrounding Dykes' complaint are somewhat convoluted, and are not entirely relevant to

the remaining claims in this action. The Court will endeavor to recapitulate those portions of Dykes' allegations which support his remaining claims.

Dykes alleges that he was charged with misconduct for participating in the unauthorized occupation of a cell after a white prisoner, Bourne, was found near Dykes' cell. (Doc. 1 at 10-11). Dykes further alleges that the white prisoner, despite being charged with the same misconduct, "received NO SANCTION AT ALL because he was found NOT GUILTY!" (Doc. 1 at 11). Dykes asserts that "[t]he ONLY and Obvious explanation for th[is] discrimination is RACE." (*Id*.). In an attached statement of facts, apparently produced in relation to Dykes' misconduct hearing, he averred that "[a]t no point did Mr. Bourne enter my cell . . . . Mr. Bourne knocked on my door, and by the time I opened the door, and sat on the bed, [a corrections officer] was handcuffing him." (*Id*. at 18). He later notes in a Class II and Class III Misconduct Appeal form that Bourne "who was accused of being in my cell, was found <u>"Not Guilty"</u> of being in my cell, but [rather was] found guilty of being in the hallway. Therefore I cannot be guilty of this prisoner being in my cell." (*Id*. at 20).

Dykes also attaches to his complaint a prisoner kite in which he complained that he was denied a grievance rehearing, but that defendant hearing investigator Osborn "fraudulently forged" a document stating that the rehearing had taken place. (Doc. 1 at 28). In that kite, Dykes told defendant deputy warden McRoberts "I'm afraid to write a grievance on this matter, because if these high ranking officials will make a bold move such as this, surely they have the authority and means to retaliate against me, therefore I

8

am coming to you, with the hopes of being protected from further injustices and abuses." (*Id*.). In an attached letter to the Michigan Department of Corrections ("MDOC") Director's Office, Dykes contends that in retaliation for reporting Osborn's fabricated statements regarding his rehearing, McRoberts "conducted and approved the transfer [to another prison], for exposing these staff members, in an attempt to shut me up." (*Id*. at 31-32). In a kite sent on March 17, 2013, Dykes asserts that he drafted his grievance on February 5, 2013, and was transferred on February 22, 2013. (*Id*. at 39).

### b.   Defendants' Motion to Dismiss

In their motion to dismiss, Defendants assert that both Dykes' First Amendment and Equal Protection claims are barred because he failed to pursue his administrative remedies through the grievance process. (Doc. 30 at 7-12). Defendants note that Dykes has pursued ten grievances through Step III of the grievance process during his time at IBC and ARF, the prisons in which he alleged he experienced retaliation and discriminatory conduct in violation of his Equal Protection rights. (Doc. 30 at 7-10). Defendants assert that three of Dykes' Step III grievances post-date the submission of his complaint, and thus cannot serve as the basis for his retaliation claim, and that his other seven Step III grievances pertain to different issues. (*Id*. at 8-10). Defendants also argue that Dykes failed to raise the issue of race discrimination in any of his misconduct hearings, and thus is barred from raising those claims here. (*Id*. at 10-12).

### c.   Dykes' Retaliation Claim

9

To state a claim for retaliation under the First Amendment, a plaintiff must allege that (1) he engaged in protected conduct, (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that protected conduct, and (3) there is a casual connection between the first two elements, *i.e.*, the adverse action was motivated at least in part by the plaintiff's protected conduct. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999). The adverse action must be one that would deter a person of ordinary firmness from the exercise of the right at stake, which here is the filing of grievances against prison officials. *Id*. at 396.

Dykes does not assert that he completed the grievance process with regard to his retaliation claim. Instead, he asserts that he "wrote a kite to defendant McRoberts informing him of the corruption of defendant Smith and Osborn, asking for help, as the Plaintiff was afraid to write a grievance in fear of retaliation," and that these fears materialized when "Defendant McRoberts in turn retaliated against the plaintiff by transferring the plaintiff to a disciplinary facility," resulting in his loss of prison job and an increase in his security rating. (Doc. 34 at 3). A prisoner's claim cannot be barred by reason of failure to exhaust their administrative remedies when those remedies are "functionally unavailable," including if prison officials threaten retaliation for filing grievances. *Himmelreich v. Fed. Bureau of Prisons*, 766 F.3d 576, 577-89 (6th Cir. 2014).

Because, by his own admission, Dykes did not complete the grievance process with regard to his retaliation claim, the Court must examine whether he experienced an

"adverse action" which was motivated by his participation in protected conduct. *Thaddeus-X*, 175 F.3d at 394. Filing non-frivolous grievances and lawsuits is a constitutionally-protected activity; there is no indication that Dykes acted frivolously by pursuing the relevant grievances and misconduct hearings, thus his activities are protected. *Siggers–El v. Barlow*, 412 F.3d 693, 699 (6th Cir. 2005). This follows from the well-established principle that "prisoners have a constitutional right of access to courts." *Id*.

The Court must next determine whether Dykes suffered an adverse action which would deter a person of ordinary firmness from engaging in protected conduct. Defendants argue that Dykes "filed 12 new grievances within a few months of his arrival at IBC," and conclude that he was not deterred from pursuing grievances by his transfer to that facility. (Doc. 35 at 2). However, the Sixth Circuit has found that the "ordinary firmness" inquiry is "more objective than subjective," thus evidence that the plaintiff was not actually deterred from engaging in further protected conduct "offers some probative evidence," but does not conclude that inquiry. *Smith v. Yarrow*, 78 F. App'x 529, 541 n.8 (6th Cir. 2003).

Defendants also argue that Dykes could not have been deterred from filing grievances following his transfer to IBC "in light of the fact that his transfer from ARF distanced him from Captain Smith and Hearings Investigator Osborn, the individuals who allegedly struck fear in Plaintiff." (Doc. 35 at 2). Given the objective nature of this inquiry, the relationship between a particular prisoner and a particular official offers little

11

insight. The more pertinent question is whether the transfer from one prison to another is itself an adverse action which would deter a prisoner of ordinary firmness.

The Sixth Circuit has held that "prisoners are expected to endure more than the average citizen . . . [thus] ordinarily a transfer would not deter a prisoner of ordinary firmness from continuing to engage in protected conduct." *Siggers-El*, 412 F.3d at 701. However, that court has also found that "a prison transfer or the threat of a transfer can be an adverse action if that transfer would result in foreseeable, negative consequences to the particular prisoner" *Hill v. Lappin*, 630 F.3d 468, 474 (6th Cir. 2010). The Sixth Circuit has not set forth a list of "foreseeable, negative consequences" which always constitute an adverse action. The Court will thus examine relevant Sixth Circuit decisions to determine when a prison transfer may be considered adverse.

In *Jewell v. Leroux*, 20 F. App'x 375, 377 (6th Cir. 2001), the Sixth Circuit noted that "[a] prisoner has no constitutional right to prison employment," and found that a prisoner who alleged that he was transferred and lost his prison job had not set forth facts showing that he suffered an adverse action. In *King v. Zamiara*, 150 F. App'x 485, 494 (6th Cir. 2005), the Sixth Circuit again found that a prison transfer which "did not deprive [the prisoner] of access to an attorney or deprive him from prison employment that allowed [him] to pay for an attorney" did not constitute an adverse action. In *Hermansen v. Kentucky Dep't of Corr.*, 556 F. App'x 476, 477 (6th Cir. 2014), that court concluded that a prisoner who was transferred to another facility had not suffered an

adverse action because he did not allege that his access to the courts was thereby limited or that he was placed in a more dangerous prison unit.

In *Siggers-El*, the Sixth Circuit found that a transfer which stripped a prisoner of a "high paying job that he needed in order to pay his attorney" and which "made it more difficult for his attorney to visit with or represent him because he was moved further away from her" was sufficient to constitute retaliatory conduct which would deter a prisoner of ordinary firmness. 412 F.3d at 701-02. In *Pasley v. Conerly*, 345 F. App'x 981, 985 (6th Cir. 2009), the Sixth Circuit found that a prison transfer could constitute an adverse action where a prison official threatened the prisoner with "hav[ing] him moved out of the unit so that he would lose his job" and with "mov[ing the prisoner] to a location where his family would not be able to visit him."

In *Hill*, the Sixth Circuit found that "[b]eing threatened with a transfer to a more restrictive living environment with fewer privileges would deter a person of ordinary firmness from exercising the constitutional right to file grievances;" in that case, the "more restrictive living condition" was transfer to a "lock-down unit." 630 F.3d at 475. In *Thaddeus-X*, the Sixth Circuit found that transfer to an "administrative segregation" unit could also be considered an adverse action. 175 F.3d at 398.

Dykes argues that defendant McRoberts retaliated against his exercise of protected conduct by transferring him to a "disciplinary facility" (Doc. 1 at 7, 10), and that as a result of the transfer he "loss [sic] his Kitchen Detail where he was making between 40 and 60 dollars a month, and now has had to request Indigent Status due to not being able

13

to obtain a work detail due to the number of prisoners on the waiting list." (*Id*. at 10). Dykes asserts in his motion for summary judgment that he also suffered "a security increase" as a result of his transfer to IBC, "which will ultimately reflect negatively in his consideration for parole, resulting in a longer stay in prison." (Doc. 34 at 3-4).

Considered individually or in combination, Dykes' alleged loss of his high-paying prison job, transfer to what he characterizes as a disciplinary facility, and alleged security increase do not constitute adverse actions. Dykes is proceeding *pro se* and does not allege that his transfer to IBC resulted in loss of access to counsel. (Doc. 1 at 10). While Dykes alleges that the loss of his prison job impoverished him to the point where he was required to file this action *in forma pauperis*, his access to the courts has not been limited in any substantial manner. (Doc. 1 at 10). Pursuant to 28 U.S.C. § 1915, prisoners seeking to file an action *in forma pauperis* must apply for that status and demonstrate their inability to afford the filing fees; complaints filed pursuant to that statute are subject to screening and *sua sponte* dismissal. Dykes' ability to file meritorious complaints has thus not been limited.

Dykes' assertion that IBC is a "disciplinary facility" is not well supported. (Doc. 1 at 7, 10). While Defendants do not contest this allegation, Dykes does not set forth the ways, if any, that IBC differs from the prison in which he was formerly incarcerated, ARF. The Court notes that IBC and ARF are both facilities which house prisoners categorized at security levels I, II, and IV. *See* MDOC, Gus Harrison Correctional Facility,     http://www.michigan.gov/corrections/0,4551,7-119-68854_1381_1385-5359--

,00.html (last visited November 3, 2015); MDOC, Bellamy Creek Correctional Facility, http://www.michigan.gov/corrections/0,1607,7-119-1378-5481--,00.html (last visited November 3, 2015). Courts in this circuit have found that, without more, allegations that a prisoner was transferred from one facility to another that houses inmates of the same security classification is not sufficient to demonstrate an adverse action. *See Hardison v. Murphy*, No. 14-CV-10939, 2015 WL 1015115, at *8 (E.D. Mich. Mar. 9, 2015); *Abram v. Corizon Health, Inc.*, No. 14-CV-11431, 2015 WL 998518, at *6 (E.D. Mich. Mar. 6, 2015); *Jones v. Caruso*, No. 1:10-CV-812, 2011 WL 1467647, at *8-9 (W.D. Mich. Apr. 14, 2011).

Similarly, Dykes' assertion that he suffered "a security increase" as a result of his transfer to IBC is not well supported by the evidence before the Court. (Doc. 34 at 3-4). Dykes cites Exhibit M for this proposition, a Classification Screen – Review, signed by defendant McRoberts. (*Id.*). That document uses a series of questions to determine, through a numerical classification system, the security and management levels at which a prisoner should be housed. Dykes' confinement level is listed at "II," his management level remained at "I" despite an increase from "1" to "2" management points, and both his "True Security Level" and "Actual Placement Level" were assessed at "II." (*Id.*). Thus, the only document which Dykes references to support his claim that he is now housed at an increased security level actually demonstrates that his security level remained consistent following his transfer to IBC. There is also no evidence to support

Dykes' assertion that his transfer to IBC will result in a longer stay in prison. (Doc. 34 at 3-4).

The evidence before the Court indicates that Dykes did not suffer any adverse action. His transfer from the general population of one prison to another of the same type cannot support such a claim. Similarly, while Dykes asserts that he lost his prison job and must now file *in forma pauperis*, he has not alleged that his transfer reduced his access to the courts. Finally, nothing in the record supports Dykes' claim that his security classification was increased or that he will serve a longer term in prison as a result of his transfer. Dykes has failed to present any evidence supporting his allegations, but rather has rested upon his pleadings. Summary judgment is thus appropriate as to Dykes' retaliation claim.

Because the Court finds that Dykes did not suffer an adverse action which would deter a prisoner of ordinary firmness, it is unnecessary to examine whether there was a causal connection between his protected conduct and the alleged adverse action he suffered.

### d.    Dykes' Equal Protection Claim

Dykes next argues that he properly exhausted his equal protection claim, or in the alternative was not required to exhaust because of his previously discussed fear of retaliation. In his complaint, Dykes asserts that he and Bourne were accused of committing the same offense, yet Bourne, a white inmate, was given no sanction, whereas Dykes was found guilty of misconduct. (Doc. 1 at 10-11). Dykes concludes that

16

"the ONLY and Obvious explanation for the discrimination is RACE." (*Id.* at 11). In his response to Defendants' motion to dismiss, Dykes asserts that he pursued his administrative remedies challenging his "deni[al of] the same treatment as prisoner Bourne." (Doc. 34 at 2). However, Dykes also notes that while he "wrote a grievance on the unequal treatment . . . he was afraid to write a grievance." (*Id.* at 3). As previously discussed, Dykes has failed to present a question of material fact regarding whether he experienced retaliation, thus his assertion of retaliation cannot excuse his failure to exhaust his equal protection claim. Consequently, Dykes' equal protection claim is properly before this Court only if he properly exhausted that claim through the administrative grievance process.

Congress passed the Prison Litigation Reform Act of 1995 ("PLRA") "in response to a sharp rise in prisoner litigation in federal courts." *Woodford v. Ngo*, 548 U.S. 81, 83 (2006). By passing the PLRA, Congress attempted to ensure that "the flood of nonmeritorious [prisoner civil rights] cases [did] not submerge and effectively preclude consideration of the allegations with merit." *Jones v. Bock*, 549 U.S. 199, 202 (2007). Congress equipped the PLRA with several mechanisms designed to reduce the quantity and increase the quality of the claims that came to federal court. *Id.* A "centerpiece" of the PLRA was the "invigorated" exhaustion requirement: "No action shall be brought with respect to prison conditions under § 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a) (2000); *see also Woodford*, 548 U.S. at 84

17

("A centerpiece of the PLRA's effort 'to reduce the quantity . . . of prisoner suits' is an 'invigorated' exhaustion provision.") (quoting *Porter v. Nussle*, 534 U.S. 516, 524 (2002)). Courts consider the PLRA's suits 'brought with respect to prison conditions' to include "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter*, 534 U.S. at 532.

The *Woodford* Court held that the PLRA's exhaustion of administrative remedies requires (1) that no remedies currently remain available, and (2) that the remedies that had been available to the prisoner were "properly" exhausted. 548 U.S. at 93. "Proper exhaustion" means that the plaintiff complied with the administrative "agency's deadlines and other critical procedural rules." *Id*. at 90. Complaints and appeals must be filed "in the place, and at the time the prison's administrative rules require." *Id.* at 87 (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002)).

In *Jones*, the Court instructs us to look to the prison's policy itself when determining "whether a prisoner has properly exhausted administrative remedies– specifically, the level of detail required in a grievance to put the prison and individual on notice of the claim." 549 U.S. at 205, 218 ("The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the *prison's requirements*, and not the PLRA, that define the boundaries of proper exhaustion." (emphasis added)). The current MDOC grievance policy directive ("P.D.") 03.02.130 requires that prisoners must specifically include "[d]ates, times,

18

places, and names of all those involved in the issue being grieved." *See also Laster v. Pramstaller*, No. 06-13508, 2008 WL 474146, at *4 (E.D. Mich. Feb. 15, 2008). Certain issues are non-grievable, including decisions made in major misconduct hearings; prisoners seeking review of such decisions must instead apply for a misconduct appeal. *See* MDOC PD 03.03.105; *Lee v. Unknown Palus*, No. 4:04-CV-51, 2005 WL 2253582, at *3 (W.D. Mich. Sept. 15, 2005) (discussing this standard). However, unlike PD 03.02.130, PD 03.03.105 does not specify what information a prisoner's misconduct appeal must contain. A prisoner seeking further review of a major misconduct decision may appeal to the Michigan circuit courts, though this step is unnecessary for a prisoner to have exhausted his administrative remedies. *See Black v. Michigan Dep't of Corr.*, No. 2:10-CV-11211, 2012 WL 994768, at *10 (E.D. Mich. Feb. 29, 2012) (noting that a prisoner need not exhaust judicial remedies to exhaust administrative remedies); *Reeves v. Hofbauer*, No. 1:04CV782, 2007 WL 4557858, at *3 (W.D. Mich. Dec. 20, 2007) (noting that a prisoner may seek further review of a major misconduct rehearing in the Michigan circuit courts).

Attached to Dykes' complaint are documents apparently produced in relation to his misconduct hearings. (Doc. 1 at 17-27). On January 5, 2013, Dykes submitted a letter to "Class Two Hearing Officer" in which he challenged that "[a]t no time did Mr. Bourne enter my cell. At no time did c/o Sands observe Mr. Bourne in my cell. Mr. Bourne knocked on my door, and by the time I opened the door, and sat on the bed, c/o Sands and c/o Thompson was handcuffing him." (*Id.* at 18). He further challenged that the "Reporter

19

intentionally failed to be clear about the relevant circumstances . . . . [and] failed to describe how I violated this rule." (*Id*.). On January 12, 2013, Dykes filed a "Class II and III Misconduct Appeal" in which he noted that Bourne, "who was accused of being in my cell, was found <u>"Not Guilty"</u> of being in my cell, but was found guilty of being in the hallway. Therefore I cannot be guilty of this prisoner being in my cell." (*Id*. at 20). This appeal does not contain any allegations of racial discrimination, but instead focuses on the apparent logical impossibility of Bourne being found not guilty of being in Dykes' cell, but Dykes being found guilty of Bourne being in his cell. (*Id*.).

A note of unknown provenance, apparently produced on January 18, 2013, states that "[t]he hearing report evidence and reason for finding are inadequate and provide no written reason for finding you guilty. Appeal approved." (*Id*. at 21). A "Class II and III Misconduct Report Rehearing," apparently produced on January 30, 2013, notes that Dykes pled "guilty" to the offense committed on January 4, 2013. (*Id*. at 27). On February 5, 2013, Dykes sent a letter to a "Hearing Investigator" in which he noted that "on 1-23-2013 my class (2) appeal, (of the misconduct written on me on 1-4-13) was approved; I am inquiring whether this misconduct was removed from my file?" (*Id*. at 25). On the same sheet, an unknown person responded "you were found guilty at the rehearing appeal so no it wouldn't be removed." (*Id*.).

Defendants argue that Dykes did not properly exhaust his administrative remedies because his misconduct reports do not reflect allegations of racial discrimination, but rather merely assert that he and Bourne were treated differently. (Doc. 30 at 11).

20

Defendants are correct that Dykes appears to have first alleged racial discrimination in the instant complaint, and did not even allude to such a motivation in his misconduct appeals, grievances, or elsewhere in the administrative paperwork he provides. For the reasons discussed below, this failure is fatal to his equal protection claim.

The Sixth Circuit has held that a prisoner need not "allege a specific legal theory or facts that correspond to all the required elements of a particular legal theory. Rather, it is sufficient for a court to find that a prisoner's Step I problem statement gave prison officials fair notice of the alleged mistreatment or misconduct." *Burton v. Jones*, 321 F.3d 569, 575 (6th Cir. 2003) abrogated on other grounds by *Jones v. Bock*, 549 U.S. 199 (2007). Where a prisoner fails to allege that he was treated differently because of his race, he fails to give fair notice of the alleged misconduct; without the mention of race, the alleged different treatment could be the result of caprice, friendship, legitimate concerns, or an infinite array of other reasons. Accordingly, a prisoner who fails to mention race in connection with his alleged unfair treatment, fails to exhaust an equal protection claim. *See Peters v. Deweerd*, No. 4:05-CV-53, 2005 WL 1831748, at *3 (E.D. Mich. Aug. 1, 2005) (finding that a prisoner failed to exhaust where he alleged he was treated arbitrarily and capriciously but "did not allege racial discrimination" in his grievance); *see also Logue v. Chatham Cnty. Det. Ctr.*, 152 F. App'x 781, 783 (11th Cir. 2005) (prisoner "did not exhaust his equal-protection claim where he did not refer to race prior to filing his complaint and did not assert any problem with the grievance procedure prior to lodging objections to the Report and Recommendation."); *Johnson v. Johnson*, 385 F.3d 503, 518

21

(5th Cir. 2004) (prisoner failed to exhaust equal protection claim where "his grievances do not mention his race at all," noting that "[e]ven though Johnson need not present a full-fledged legal theory in his grievance, his grievances must alert prison officials to a problem and give them an opportunity to address it," and that while "[h]is grievances gave them notice that there was a problem . . . we do not think that they can be read to give notice that there was a race-related problem."); *Medera v. Griffin*, No. 02C1064, 2003 WL 132496, at *11 (N.D. Ill. Jan. 14, 2003) (prisoner failed to exhaust equal protection claim where he claimed defendants mistreated him and failed to address his complaints but "in reviewing those grievances, the court finds no mention whatsoever of the plaintiff's heritage, nor any reference to racial slurs.").[1] I therefore suggest that Defendants' motion for summary judgment should also be granted as to Dykes' equal protection claim.

Since I suggest that Defendants are entitled to summary judgment, I need not address Dykes' motion for summary judgment. (Doc. 34).

### D.   Conclusion

For the reasons above, I recommend that Defendants' motion for summary judgment (Doc. 30) be **GRANTED;** Plaintiff's motion for default judgment (Doc. 32) be **DENIED**; Plaintiff's motion for summary judgment (Doc. 34) be **DENIED**; and that Plaintiff's objection to the Court's order requiring response (Doc. 32) be **DENIED**.

---

[1] I note that even if the claim were exhausted, mere inconsistent treatment in relation to prisoner Bourne alone may not be sufficient to demonstrate an equal protection violation, since such a claim requires that the plaintiff show he "was victimized because of some suspect classification" not simply that another inmate was treated differently. *Newell v. Brown*, 981 F.2d 880, 887 (6th Cir. 1992); *Booher v. United States Postal Service*, 843 F.2d 943, 944 (6th Cir. 1988).

### E.   <u>Review</u>

Rule 72(b)(2) of the Federal Rules of Civil Procedure states that "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 155; *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). According to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection

No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: November 5, 2015                    /S
                                          Patricia T. Morris
                                          United States Magistrate Judge

## <u>CERTIFICATION</u>

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record. A copy was also sent via First Class Mail to Robert Dykes #201541 at Michigan Reformatory, 1342 West Main Street, Ionia, MI 48846.

Date: November 5, 2015                    By s/Kristen Krawczyk
                                          Case Manager to Magistrate Judge Morris